UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID EDWARD FULLMORE, | No.  2:14-cv-614-EFB P |
| Petitioner, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS[1] |
| McDONALD, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered against him on May 20, 2011, in the Sacramento County Superior Court (No. 09F06445) on three counts of second degree robbery and one count of false imprisonment, with findings that he personally used a firearm.  Petitioner seeks federal habeas relief on the grounds that (1) the trial court's failure to declare a mistrial deprived him of his right to a fair trial, and (2) the trial court erred by imposing a consecutive sentence on counts three and four.[2]  Upon careful consideration of the record and

---

[1] Respondent did not respond to the court's order directing him to complete and return the form indicating either his consent to jurisdiction of the magistrate judge or request for reassignment to a district judge.  Accordingly, the clerk will be directed to randomly assign this case to a district judge.

[2] Petitioner raised this second claim in his August 29, 2014 motion to amend.  ECF No. 16.  Although the court granted the motion, petitioner never filed an amended petition.  *See* ECF Nos. 17, 19.  In an abundance of caution, the court will address this sentencing claim in addition to the mistrial claim that petitioner presented in his original petition (and also repeated in his motion to amend).  *See* ECF No. 1.

1

the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

## I.     Background

In its unpublished opinion affirming petitioner's judgment of conviction, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> **FACTS AND PROCEEDINGS**
>
> Defendants and Antonio Howard spent the night of August 25, 2009, at the apartment of defendant Fullmore's sister, Nycquia Fullmore. At the time, Nycquia and defendant Nesbit were dating. Howard is the half brother of three of Nycquia's children. Although not actually related, Fullmore and Howard were close and referred to each other as "cousins."
>
> The apartment complex was located next to a liquor store and a Payday Loans. A Chevron gas station was located across the street. A Round Table pizza was also located nearby.
>
> Around 11:00 a.m. the next morning, on August 26, Nycquia and Nesbit showered together. After showering, Nycquia asked Nesbit to go to the liquor store to get her some candy. Nesbit left alone but returned a few minutes later because he needed more money. Nesbit and Fullmore then left the apartment together. A short time later, Howard left the apartment to catch up to Nesbit and Fullmore.
>
> When he left the apartment, Nesbit was wearing a brown and white checkered shirt and reddish jeans. Fullmore was wearing a white shirt and jeans.
>
> All three men returned to the apartment about 10 minutes later; although Nycquia testified her time estimates the day of the robberies were not absolutely precise. Upon their return, defendants and Howard watched television. Later, Nycquia walked outside to the mailboxes to collect the mail, which was usually delivered to the apartment complex between 11:00 or 11:15 a.m. While outside Nycquia saw several police officers questioning people in the apartment complex. Nycquia called Nesbit, who was still inside the apartment, and told him about the police. Nesbit seemed agitated over the phone. A few minutes later, the police knocked on Nycquia's apartment door to investigate two robberies that occurred at the Payday Loans and Chevron earlier that day.
>
> *A. Count Two—Payday Loans Robbery*
>
> At approximately 11:20 a.m., M.W. was walking to work at the Round Table near the apartment complex. Before going to work, M.W. stopped at the Payday Loans to cash a money order.

2

As M.W. approached the Payday Loans, he saw two men standing beside a garbage can. The taller man called out, asking M.W. to come over to where they were standing. M.W. declined. The taller man followed him into the Payday Loans and stood looking over his shoulder before leaving. After cashing the money order, M.W. walked out of the building. Once outside, the taller man grabbed his arm while the shorter man pulled a silver gun with a black handle from the right front pocket of his jeans, shoved it in M.W.'s ribs, and said, "If you move, I'm going to shoot you." The shorter man grabbed between $60 and $80 from M.W.'s pocket. The shorter man then walked away and the taller man followed a few seconds later.

M.W. called police to report the incident. He described the man with the gun as a black man approximately five-foot-six or five-foot-seven, weighing about 150 to 160 pounds. He had short hair, hazel eyes, and was wearing a red shirt and a white shirt and blue jeans. M.W. described the taller assailant as a black man approximately five-foot-ten to six feet tall and weighing between 140 to 150 pounds. The taller man had a mustache, wore a brown shirt and had dread locks in his hair, which M.W. later clarified meant braids. M.W. described the gun as a silver and black .32-caliber revolver.

While interviewing M.W. around 11:40 a.m. that morning, the officer heard a dispatch report about a second robbery that had just occurred at the Chevron. The suspects were two black males generally fitting M.W.'s description of the two men who accosted him at the Payday Loans moments earlier.

*B. Count Three—Chevron Robbery*

Because Fullmore does not challenge his conviction for the count three robbery of D.R. at the Chevron, and Nesbit challenges his conviction only to the extent that insufficient evidence shows he aided and abetted Fullmore in the robbery, the facts regarding count three are recounted in the light most favorable to the judgment. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

At approximately 11:30 a.m. that day, D.R. was at the Chevron gas station across the street from the Payday Loans purchasing some items in the convenience store. D.R. walked outside to her car where Fullmore approached her. While D.R. sat in her car, Fullmore stood between the door and the car to prevent D.R. from closing the door. Fullmore demanded D.R.'s money and pulled up his shirt to reveal a silver gun in the right front pocket of his jeans.

After rifling through her purse and locating only loose change, Fullmore ordered D.R. into the convenience store to withdraw money from an ATM machine. Nesbit followed them inside. Once inside, Fullmore stood beside D.R. while she withdrew $200 and Nesbit talked to the cashier. Fullmore took the money directly from the machine and left. Nesbit immediately followed Fullmore out the door. Before leaving, either Fullmore or Nesbit told D.R. not to call police.

/////

When officers arrived a short time later, D.R. said she could not describe the men very well because she did not look too closely at their faces since she was scared. She did say, however, that the man with the gun was black, 18 to 20 years old, five-foot-six to five-foot-ten with curly hair and that he was wearing a white shirt and dark jeans. She said the gun was silver and that the man had light brown eyes.

*C. Surveillance Video*

Surveillance video taken inside the Chevron store shows D.R. in the store purchasing items at 11:38 a.m. The video also shows Fullmore, Nesbit, and Howard in the store moments earlier. Both Fullmore and Howard are wearing white shirts; Nesbit is wearing a brown and white checkered shirt.

Five minutes later, the surveillance video shows D.R. back in the store at the ATM machine with Fullmore. The surveillance footage also shows Nesbit talking to the clerk while D.R. and Fullmore were at the ATM machine. Nesbit exits the Chevron store almost immediately after Fullmore takes the money from the ATM machine and leaves. The surveillance video does not show Howard in the store at that time.

There was no surveillance video showing the events at the Payday Loans.

*D. Police Investigation*

Due to its proximity to both robberies, police searched the apartment complex where Nycquia lived and where defendants and Howard had stayed the previous night. The apartment manager directed officers to Nycquia's apartment.

The police knocked and announced their presence at Nycquia's apartment but no one answered. Police stationed at the rear of the apartment saw what appeared to be a black man's hand frantically trying to open a back window through the blinds.

Nycquia finally walked over from the mailboxes where she had been observing the police activity and gave officers a key to the apartment. She told officers that Fullmore, Nesbit, and Howard were inside, but only Nesbit and Howard came out once the door was opened. Fullmore was gone.

When Howard left the apartment, he had long hair pulled back in a pony tail. Howard was approximately six feet tall and weighed over 200 pounds. Nesbit had a mustache, curly hair, and was wearing a blue basketball jersey. Nesbit stood six feet tall and weighed about 195 pounds.

Police conducted separate field show ups for both victims with Nesbit and Howard. After commenting the men looked like they had changed their hair or clothes, M.W. identified Nesbit as the taller assailant and Howard as the gunman. D.R. did not identify either man.

4

Nesbit was arrested and gave a statement to police placing most of the blame on Fullmore for the robberies. Police subsequently determined Howard was not involved and he was released from custody.

While searching the apartment, the police found a brown and white checkered shirt. The police also found a silver and black .32 revolver loaded with four live rounds, stuffed in a sock, and hidden in the bedroom closet under some towels. Although she later denied it at trial, the day of the robberies Nycquia told officers the gun was Fullmore's and that he had put it in a sock on a shelf in the closet.

After being threatened with jail, Nycquia called Fullmore and told him to come back to the apartment if he did nothing wrong. Fullmore did not return. He was arrested two days later. At the time of his arrest, Fullmore was 5 feet 6 inches tall and weighed 150 pounds.

The next week a detective met with M.W. and showed him surveillance video still frames from inside the Chevron store. M.W. recognized Nesbit in the still frames as the taller man at the Payday Loans because of his brown and white checkered shirt, which looked identical to the shirt police found in Nycquia's apartment. Although M.W. was sure about his previous identification of Nesbit, he was unsure of his prior identification of Howard as the shorter gunman because the gunman had short hair and Howard had long hair pulled in a pony tail at the field show up. After the detective showed M.W. a photographic lineup containing Fullmore's picture, M.W. identified Fullmore as the man with the gun. The detective did not show M.W. a photographic lineup containing Nesbit's picture.

The detective also showed M.W. pictures of the gun recovered from Nycquia's apartment. M.W. said it looked like the same gun used in the robbery.

The next day, the detective met with D.R. She, too, identified Nesbit from still frames taken from the surveillance video of the Chevron robbery. Like with M.W., the detective showed D.R. the same photographic lineup of Fullmore. D.R. identified Fullmore and said she thought he was the man with the gun at the Chevron station. The detective also showed D.R. a photographic lineup containing a picture of Nesbit. D.R. identified Nesbit as the man with Fullmore during the robbery, although she could not say whether Nesbit did or said anything to her.

*E. Trial*

Defendants were tried jointly in 2011, nearly two years after their arrest. Based on Nesbit's statements to police implicating Fullmore in the robberies, Fullmore's counsel moved for separate juries to avoid any Sixth Amendment confrontation issues. After the parties agreed Nesbit's statements would not be introduced, the court denied the motion.

/////

     During trial M.W. testified it had been a long time since the robbery and he was not sure if the defendants were the perpetrators. Defendants' appearance, especially their hairstyles, had changed from when they were arrested. Although he originally testified Fullmore looked like the shorter man with the gun, upon closer inspection M.W. said he could not tell if Fullmore was the gunman. M.W. also testified that he did not see the taller assailant in court.

     D.R. testified that Fullmore was the man with the gun at the Chevron station. She said two other men were with Fullmore outside, one of whom she identified as Nesbit. She also testified that Nesbit walked back into the Chevron with her and Fullmore, and then walked outside with Fullmore after he took the money from the ATM machine.

     Both M.W. and D.R. testified that the gun recovered from Nycquia's apartment looked like the gun used in the robberies. The parties stipulated that no name was registered to the gun with the Department of Justice, no latent fingerprints were found on the gun, and that defendants were excluded from being contributors to a mixture of DNA found on the gun from three different people. The crime lab considered the inconclusive DNA mixture not suitable for either inclusion or exclusion of specific contributors.

     The jury also heard several phone conversations between Fullmore and Nycquia while Fullmore was in jail awaiting trial. During one call, Fullmore said if there was video he was "going to be fucked." In another, Fullmore apologized to Nycquia for leaving the apartment without first grabbing that "motherfucker," which Nycquia understood to mean the gun and marijuana. In a third call, Fullmore and Nycquia joked about jumping out of the apartment's back window. Nycquia admitted she was aware her brother climbed out the back window of the apartment the day of the robberies. In another call to an unknown acquaintance made two days after being arrested, Fullmore said, "I don't know, I think somebody told on a nigga, like my cousin, because it was three of us. You know what I'm saying? And this motherfucker not even in jail."

     The jury convicted defendants on all counts and found all enhancement allegations true. Defendants timely appealed.

Cal. Court of Appeal Opinion ("ECF No. 12-1") at 2-9.

     On November 13, 2013, the California Court of Appeal, Third Appellate District, affirmed petitioner's judgment of conviction in a reasoned opinion. ECF No. 12-1. On February 19, 2014, the California Supreme Court summarily denied review. ECF No. 13, Lodged Document ("Lodged Doc.") 6.

/////

**II.     Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

be accepted as correct." *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

/////

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

9

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III.    Petitioner's Claims**

**A. Trial Court's Failure to Declare a Mistrial**

Petitioner claims that the trial court violated his right to a fair trial when it denied his motion for a mistrial after a detective inadvertently testified that Nesbit admitted to officers to being with petitioner at Payday Loans. ECF No. 1 at 4. Although it acknowledged the parties' previous understanding that Nesbit's statements to police would not be introduced in evidence, the trial court concluded that the detective's "errant statement at the conclusion near the end of the trial" did not render the trial fundamentally unfair. ECF No. 12-1 at 9. The trial court noted that evidence of defendants' presence together the day of the robberies near the location of the Payday Loans had already been admitted, and that the jury could decide whether defendants were together or not at that location. *Id.*

On direct appeal, the appellate court rejected petitioner's argument that the trial court had abused its discretion in denying the mistrial motion. *Id.* at 10-14. The appellate court determined that the detective's statement that Nesbit confessed to being with petitioner at the Payday Loans

10

was not "incurably prejudicial" because there was already uncontroverted evidence showing that petitioner and Nesbit were near the Payday Loans on the day of the robbery. As the court explained:

> Fullmore and Nesbit stayed the previous night at Nycquia's apartment, which was located next to the Payday Loans. The day of the robbery Fullmore and Nesbit left Nycquia's apartment to go to the liquor store to buy her candy sometime after 11:00 a.m. The liquor store was located next door to the Payday Loans. M.W. was robbed around 11:20 a.m. The surveillance video from the Chevron station—located directly across the street from the Payday Loans—also shows Fullmore and Nesbit together at approximately 11:37 a.m. In closing arguments, Fullmore's counsel even conceded Fullmore was in the area that day.
>
> Based on the state of the evidence, the trial court was amply justified in finding the detective's statement that Nesbit confessed to being with Fullmore at the Payday Loans was not incurably prejudicial. The trial court acted within its discretion in denying the motion for a mistrial.

*Id.* at 10-11. The appellate court continued, essentially finding that any error in this regard was harmless:

> Given the overwhelming evidence against defendants, we are satisfied the jury would have convicted them of robbing M.W. even in the absence of the detective's cumulative testimony regarding Nesbit's out-of-court statement that he and Fullmore were at the Payday Loans.
>
> The evidence at trial revealed the following: Based on M.W.'s eyewitness account of the robbery, the shorter man with the gun was black, five-foot-six or five-foot-seven, weighed 150 to 160 pounds and had short hair and hazel eyes. Fullmore matched that description. While it is true M.W. originally identified Howard as the gunman, he later expressed doubt about that identification because Howard had a long ponytail at the field show up and the gunman had short hair. At six feet tall and over 200 hundred pounds, Howard was also physically much larger than the gunman. When shown a photographic lineup of Fullmore, M.W. immediately identified him as the gunman.
>
> Based on his observation of the crime, M.W. also described the taller man who grabbed him as black, approximately five-foot-ten to six feet tall with a mustache, short dreads or braids, and wearing a brown shirt. When he was arrested, Nesbit was six feet tall with curly hair and a mustache. The Chevron surveillance video shows Nesbit wearing a brown and white checkered shirt that morning, which police later found in Nycquia's apartment. M.W. also identified Nesbit at the field show up as the taller assailant who grabbed him outside the Payday Loans, and identified him again after seeing Nesbit in the Chevron video wearing the brown and white shirt.

11

That M.W. did not definitively identify Fullmore or Nesbit during trial is not surprising. Trial occurred nearly two years after M.W. was robbed, and the defendants had changed their appearance, especially their hairstyles. It is more revealing that M.W. identified Nesbit in the field show up the day of the robbery, confirmed his previous identification of Nesbit a week later after seeing video surveillance stills from the Chevron, and immediately picked Fullmore out of a photographic lineup after he was arrested.

M.W. described the gun the man pulled from his right front pocket of his jeans as a silver .32 revolver with a black handle. Similarly, Fullmore lifted his shirt to reveal a silver gun in the right front pocket of his jeans when robbing D.R. at the Chevron. A silver .32 revolver with a black handle was found hidden in a sock in Nycquia's apartment—the same apartment where Fullmore and Nesbit had been staying. And, Nycquia told officers the gun was Fullmore's. Both D.R. and M.W. also testified the gun found in Nycquia's apartment resembled the gun used in each of their respective robberies. Based on this evidence the jury reasonably could have concluded Fullmore used the gun found in Nycquia's apartment to rob M.W. and D.R.

The fact that Fullmore's fingerprints or DNA were not found on the gun is not particularly meaningful. As the parties stipulated, it is only by chance that someone leaves a latent fingerprint, and whether a person leaves DNA on an object they handle depends on many factors. Also, the DNA mixture was not appropriate for including or excluding possible contributors.

Defendants' conduct when police searched the apartment complex also shows a consciousness of wrongdoing which the jury could have inferred against defendants. Nesbit seemed agitated after Nycquia called and told him police were outside. In an apparent attempt to alter his appearance, Nesbit changed his brown and white checkered shirt to a blue basketball jersey. When police arrived at Nycquia's apartment a few minutes after Nycquia called Nesbit, Fullmore was gone. He had climbed out the back window and fled. Fullmore did not return when Nycquia called and told him to come back if he did nothing wrong.

Deliberately altering one's appearance gives rise to a consciousness of guilt inference. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1001.) So, too, does fleeing from the scene or attempting to hide or suppress evidence and the jury was so instructed. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [consciousness of guilt may be inferred where defendant departs scene to avoid being observed or arrested]; *People v. Watkins* (2012) 55 Cal.4th 999, 1027 [hiding a weapon evidences a consciousness of guilt].)

Fullmore's recorded jail phone calls also constitute further evidence supporting defendants' convictions. Fullmore told Nycquia he should have grabbed the gun before he left, and joked about climbing out the back window of the apartment when the police arrived. Fullmore also said his "cousin"— Howard—likely snitched because three of them were involved and only Fullmore and Nesbit were in jail, implying he and Nesbit had in fact committed the

12

robberies. And most telling, Fullmore admitted that if there was surveillance video that he was "going to be fucked."

Relying on *People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete*), defendants argue that improperly admitted testimony alluding to a defendant's purported confession requires a mistrial. That case is distinguishable, however. There a police officer deliberately referred to the defendant's suppressed statement implying the defendant had already confessed to the crime. (*Id*. at pp. 830–831.) The court struck the testimony and admonished the jury to disregard it entirely, but denied defendant's motion for mistrial. (*Id*. at pp. 831–832.) The appellate court reversed holding the curative instruction could not undo the damage inflicted by referring to the suppressed statement. (*Id*. at p. 834.) In reaching its decision, the appellate court emphasized the case against the defendant was "not overwhelming" and that the detective had deliberately disobeyed the court's order precisely to prejudice the jury against the defendant. (*Id*. at p. 834, *see also id.* at p. 836.)

Here, by contrast, the detective's testimony referred to Nesbit admitting he was near the Payday Loans with Fullmore, and not that he confessed to robbing M.W. The direct and circumstantial evidence of defendants' guilt, moreover, was substantial. Unlike in *Navarrete*, an admittedly "less than airtight case" (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834), the overwhelming weight of the evidence shows that Fullmore and Nesbit robbed M.W. at the Payday Loans. And nothing in the record suggests the detective purposefully testified to Nesbit's statement to prejudice the jury. As the trial court noted, the officer was merely responding to an open ended question from Nesbit's counsel as to why he did not show M.W. a photographic lineup of Nesbit.

Even without the detective's testimony that Nesbit confessed to being with Fullmore at the Payday Loans, it is clear beyond a reasonable doubt the jury would have convicted defendants of the count two robbery. Defendants, therefore, suffered no prejudice from a single, inadvertent reference to Nesbit's statement at the conclusion of trial. The statement was merely cumulative of other properly admitted evidence.

ECF No. 12-1 at 11-14.

Petitioner has not shown he is entitled to federal habeas relief on this claim. The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'"

13

*Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)). Even then, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley*, 568 F.3d at 1101. Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* Under these standards, the state appellate court's rejection of petitioner's claim here does not support the granting of federal habeas relief under AEDPA because the trial court's admission of the detective's testimony did not violate any principle of clearly established federal law. *Id.*

Moreover, "[h]abeas relief is usually warranted only if the alleged constitutional errors had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Jackson v. Brown*, 513 F.3d 1057, 1069-1070 (9th Cir. 2008) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The state appellate court determined, in essence, that any error in admitting the detective's testimony was harmless. This court agrees. As the state appellate court explained, the detective's statement was cumulative of other evidence that Nesbit was with petitioner at the Payday Loans around the time the robbery was committed, and there was other significant and substantial evidence of petitioner's guilt. In light of these circumstances, the detective's testimony would not have had a "substantial and injurious effect" on the verdict in this case. *See Brecht*, 507 U.S. at 623. Likewise, to the extent petitioner is claiming that admission of the detective's testimony violated his Sixth Amendment right to confront witnesses, *see* ECF No. 16 at 6-8, he is not entitled to relief, as Confrontation Clause violations are also subject to a harmless error analysis. *See Whelchel v. Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).

Petitioner has failed to demonstrate that the decision of the California Court of Appeal rejecting his argument that the trial court violated his right to a fair trial when it denied his motion

for a mistrial was contrary to or an unreasonable application of federal law.  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

### B. Trial Court's Imposition of Consecutive Sentence

Petitioner also claims the trial court erred by imposing a consecutive sentence on counts three and four "because section[s] 236 & 654 preclude multiple punishment for a robbery when both are based on the same act or course of conduct."  ECF No. 16 at 3.  He claims this is a violation of his Eighth and Fourteenth Amendment rights.  *Id.*

On direct appeal, petitioner challenged the trial court's imposition of consecutive terms. The state appellate court reasoned as follows:

> *Section 654 (Fullmore)*
>
> The jury convicted Fullmore of falsely imprisoning D.R. in count four. Fullmore contends the trial court erred in refusing to stay his count four sentence under section 654.  According to Fullmore, he harbored the single objective of taking D.R.'s money; forcing D.R. back into the Chevron station to withdraw money from the ATM machine after he obtained only loose change at her car was merely part of an indivisible course of conduct to deprive D.R. of her personal property as part of the robbery charged in count three.  Although the probation report also recommended staying the sentence under section 654, the trial court disagreed, concluding "there was an intent to rob and then a separate intent was formed to actually force her from the vehicle into the Mini Mart."  We conclude substantial evidence supports the trial court's finding and reject Fullmore's contention.
>
> Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute does not prohibit multiple convictions for the same conduct, only multiple punishments.  (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.)  "In such a case, the proper procedure is to stay execution of sentence on one of the offenses." (*Ibid.*)
>
> In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent.  (*People v. Porter* (1987) 194 Cal.App.3d 34, 38 (*Porter*).)  "If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  (*Ibid.*) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court,

15

whose finding will be upheld on appeal if there is any substantial evidence to support it." (*Ibid.*)

The record in this case supports the trial court's finding that the robbery of D.R. and her false imprisonment involved multiple objectives even though they may have shared common acts or were otherwise parts of an indivisible course of conduct. A reasonable inference from the record is that Fullmore initially planned only to rob D.R. of the contents of her purse while seated in her car, but thereafter came up with a new idea: falsely imprisoning D.R. by forcing her from her car and back inside the Chevron convenience store to compel her to withdraw money from the ATM machine. Similar conduct has been found separately punishable under section 654. (*See Porter*, *supra*, 194 Cal.App.3d at p. 38 [defendant properly convicted and sentenced for robbery of victim's wallet and of kidnapping for the purpose of a robbery involving the compelled withdrawal of funds from an automated teller machine].)

The decision in *Porter* is instructive. There, the victim was getting into his car when the appellant jumped into the vehicle while brandishing a knife. (*Porter*, supra, 194 Cal.App.3d at p. 36.) The appellant's accomplice got in and rifled th[r]ough the victim's wallet. (*Ibid.*) After finding less than $10, the appellant ordered the victim to drive to a bank to withdraw additional money from an ATM machine, which was unsuccessful. (*Ibid.*) The appellant was ultimately convicted of robbing the victim and kidnapping for the purpose of robbery. (*Ibid.*) The court upheld his punishments for both crimes, rejecting the appellant's argument that section 654 precluded double punishment since appellant had a single objective of robbing the victim. (*Id.* at pp. 37-38.) "What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant achieve a greater reward." (*Id.* at pp. 38-39.)

This is precisely what occurred here. No longer satisfied with simply taking the coins he found in her purse, Fullmore decided to forcibly compel D.R. to exit her car and walk back into the Chevron convenience store where, only with her assistance in withdrawing money from the ATM machine, did Fullmore achieve a greater reward. Falsely imprisoning D.R. to compel her to do so was qualitatively different than merely taking the money from her purse while she was seated in her car.

That Fullmore did not force D.R. to drive several city blocks to a bank like the victim in *Porter* does not render Fullmore's false imprisonment conduct incidental to the robbery as he argues. Since Fullmore had previously been inside the store, a reasonable inference exists that he was aware of the ATM located inside and thus there was no need to force D.R. to drive to a bank. Yet like in *Porter*, the secondary plan of forcing her to withdraw money from the ATM, hatched after obtaining an initially disappointing haul, remains the same.

16

> The trial court did not violate section 654 by imposing consecutive sentences on Fullmore for the robbery and false imprisonment of D.R.

ECF No. 12-1 at 15-17.

Although petitioner includes a citation to the Eighth and Fourteenth Amendments, his claim for relief essentially involves the interpretation of state sentencing law. A habeas petitioner may not "transform a state-law issue into a federal one" merely by asserting a violation of the federal constitution. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997). Rather, as set forth above, petitioner must show that the decision of the California Court of Appeal somehow "violated the Constitution, laws, or treaties of the United States." *Little v. Crawford*, 449 F.3d 1075, 1083 (9th Cir. 2006) (quoting *Estelle*, 502 U.S. at 68). Petitioner's claim, which essentially involves a challenge to state sentencing laws, is not cognizable in this federal habeas action.

Even if the claim were cognizable, petitioner has failed to show that his consecutive sentences for the robbery and false imprisonment of D.R. violate the federal constitution. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Wilson v. Corcoran*, 562 U.S.1, 5 (2010) (quoting *Estelle*, 502 U.S. at 67). So long as a sentence imposed by a state court "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." *Makal v. State of Arizona*, 544 F.2d 1030, 1035 (9th Cir. 1976). *See also Miller v. Vasquez*, 868 F.2d 1116, 1118–19 (9th Cir. 1989) (issue concerning only state sentencing law not suitable for federal habeas review). Thus, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994). Here, petitioner has not shown that the state court's imposition of consecutive sentences was fundamentally unfair.

/////
/////
/////

In addition, the United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment. *See Harmelin v. Michigan*, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring). *See also Taylor v. Lewis*, 460 F.3d 1093, 1097 (9th Cir. 2006). However, successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289-90 (1983). *See also Ramirez v. Castro*, 365 F.3d 755, 775 (9th Cir. 2004). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring) (citing *Solem*, 463 U.S. at 288, 303). In *Lockyer v. Andrade*, the United States Supreme Court held that it was not an unreasonable application of clearly established federal law for the California Court of Appeal to affirm a "Three Strikes" sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior conviction involving theft of $150.00 worth of videotapes. *Andrade*, 538 U.S. at 75. The Supreme Court has also held that a "Three Strikes" sentence of 25 years-to-life in prison imposed pursuant to a grand theft conviction involving the theft of three golf clubs from a pro shop was not grossly disproportionate and did not violate the Eighth Amendment. *Ewing v. California*, 538 U.S. 11, 29 (2003).

In this case, petitioner was sentenced as a second-striker to thirty-seven years in state prison after a jury found him guilty of three counts of second degree robbery and one count of false imprisonment, with the personal use of a firearm. ECF No. 12-1 at 1-2. Petitioner has failed to show that this sentence falls within the type of "exceedingly rare" circumstance that would justify habeas relief under the Eighth Amendment.

Petitioner has failed to demonstrate that his sentence violates the Eighth Amendment proscription against cruel and unusual punishment, or that it is fundamentally unfair, in violation of the Fourteenth Amendment. Accordingly, petitioner is not entitled to relief on his claims under the Eighth and Fourteenth Amendments.

/////

/////

**IV.     Conclusion**

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court randomly assign a United States District Judge to this action.

Further, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  March 28, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE